IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

ROADTRIPS, INC., )
        Plaintiff, )
         )
    vs. )    Civil Action No. 09-1468
         )
THE HUTTON GROUP, INC., SHIRLEY )
A. HUTTON and DOUGLAS J. ASH, JR., )
        Defendants. )

MEMORANDUM OPINION

Plaintiff, Roadtrips, Inc. ("Roadtrips"), brings this action against Defendants, The Hutton Group, Inc. ("THG"), Shirley A. Hutton and Douglas J. Ash, Jr., alleging that Defendants breached contractual obligations and committed acts of fraud and negligent misrepresentation when they failed to deliver tickets to the Beijing Olympics Opening Ceremony that Roadtrips had ordered and intended to include in travel packages sold to its customers.

Presently before this Court for disposition is a partial motion to dismiss, submitted by Defendants, seeking dismissal of Count I (negligent misrepresentation) and Count II (fraud) of the complaint. For the reasons that follow, the motion will be denied.

Plaintiff's Allegations

Roadtrips is a Canadian-based travel agent with one office in Winnipeg, Manitoba. The company specializes in arranging sports-related travel, securing sporting and sports-related event tickets and booking hotel and other accommodations for other travel agencies and directly to travelers in the form of travel packages. The company does not own, plan or sponsor the events for which it helps customers book travel; nor is it affiliated with any sports organizations, leagues or teams. It acts merely as an agent; its sole service is the coordination of travel plans. (Compl.

¶ 7.)

In 2007, Roadtrips sought a secure source to supply Opening Ceremony tickets for the Beijing Summer Olympics Games 2008 to be included in travel packages sold to its customers, along with other 2008 Olympic Games travel and travel-related accommodations such as hotels, ground transportation, guides, security and other Olympic event tickets. Roadtrips identified THG as a possible source. (Compl. ¶ 8.) Shirley A. Hutton, as President and Chief Executive Officer of THG, and Douglas J. Ash, Jr., an agent and employee of THG, solicited Roadtrips with representations that it was a sound, vetted source for the Opening Ceremony tickets. Hutton described THG as an incentive company with many years of successful experience providing tickets and services to the Olympics and other events. Roadtrips received assurances from THG, from Ash in particular, that the Beijing Olympics Opening Ceremony tickets would come direct from sponsors or Olympic Family members of the International Olympic Committee. (Compl. ¶ 9.)

Roadtrips contracted with THG in reliance on the foregoing representations. In total, Roadtrips coordinated sixty-five (65) travel packages that included a total of 326 Opening Ceremony tickets. Barry and Phyllis Connelly and Borden Liu, in particular, plaintiffs and proposed class representatives ("Proposed Class Representatives") in <u>Barry Connelly et al. v. Roadtrips, Inc.</u>, Civil Action No. 4:08-CV-02987, a class action brought against Roadtrips in the United States District Court for the Northern District of Texas (the "Class Action Lawsuit"), secured 2008 Olympic Games travel packages with Opening Ceremony tickets from Roadtrips. (Compl. ¶ 10.)

Roadtrips has since learned that Ash, Hutton and THG never had any agreement or

intention to obtain tickets directly through any Olympic Games sponsor or Olympic Family member of the International Olympic Committee.  At the time Ash and Hutton induced Roadtrips to enter into the tickets contracts, Ash and Hutton instead intended to fulfill THG's ticket obligation through a third party, Harvey Slater ("Slater"), who does business through his Connecticut company, Advantage Marketing International, Inc. and, upon information and belief through Advantage Sports Hospitality and Merchandising, Advantage Sports Summer Games 1996, Inc., Tri-State Ticket Service, Inc., and Advantage Sports Classics, Inc.  Also on information and belief, Roadtrips avers that neither Slater nor his businesses had a means of obtaining tickets directly through any Olympic Games sponsor or Olympic Family member of the International Olympic Committee.  (Compl. ¶ 11.)

      Slater, instead, intended to procure the tickets for Roadtrips from a British ticket broker who would act as a "middle man."  While Ash, Hutton and THG were well aware of how Slater intended to obtain the tickets, this fact was not disclosed to Roadtrips.  Had Roadtrips known that, contrary to Ash and Hutton's representations, THG intended to use Slater, who, in turn, intended to use a British ticket broker, and THG did not, in fact, have any binding agreement to obtain the Opening Ceremony tickets through an Olympic Games sponsor or Olympic Family member of the International Olympic Committee, Roadtrips would not have entered into the ticket contracts with THG.  (Compl. ¶ 12.)

      THG failed to deliver the Opening Ceremony tickets to Roadtrips in Winnipeg well in advance of the Olympic Games as promised, explaining that delivery of Opening Ceremony tickets was delayed because of special security measures for the event.  Roadtrips remained in close contact with THG as the Olympic Games approached.  It repeatedly inquired about the

delivery status of the Opening Ceremony tickets and received additional assurances from THG in June and July 2008 that the tickets would be delivered well in advance of the Opening Ceremony and that other agents were reporting similar delays.  As the Beijing Olympics neared and the tickets still had not been delivered, THG then assured Roadtrips that the Opening Ceremony tickets would be delivered in Beijing the week before the Opening Ceremony.  (Compl. ¶ 13.)

Roadtrips learned for the first time on August 6, 2008 in Beijing–less than two full days prior to the Opening Ceremonies–that THG would not honor its agreement to deliver the tickets.  Roadtrips was forced to take immediate and extraordinary action to mitigate injury to its customers.  These steps were also necessary to salvage the business relationships Roadtrips had worked hard to develop with individual travelers and, perhaps most especially, with travel agency customers.  It immediately informed its customers by e-mail and hand delivered letters of the situation.  Roadtrips also immediately began efforts to obtain replacement Opening Ceremony tickets from other sources, but candidly reported to its customers that the search was not promising.  In fact, Roadtrips could only secure a very limited number of replacement tickets and, then, only at a cost well in excess of what the customers paid Roadtrips for the tickets.  Roadtrips provided refunds, additional compensation, as well as complimentary event tickets and other special accommodations for those for whom it could not secure replacement tickets.  (Compl. ¶¶ 14-16.)

Roadtrips incurred significant injury as a result of Ash and Hutton's misrepresentations and THG's breach of the parties' contract, including, but not limited to, the cost to purchase the limited number of replacement tickets available; the cost of refunds, additional compensation and complimentary event tickets; injury to its reputation and business relationships; diversion of

human resources to address the situation; and lost profits.  Roadtrips also faced the cost, distraction, delay and uncertainty of a Class Action suit wherein the Proposed Class Representatives sought additional payments from Roadtrips for themselves and for a broadly defined putative class of people "who purchased Beijing Olympics Opening Ceremony tickets from Roadtrips but did not receive them."  In addition to the refund of the ticket price, the Proposed Class Representatives demanded that Roadtrips provide a refund for every other aspect of their travel to Beijing, even items that Roadtrips never arranged.  Their alleged damages included hotel, airfare, ground transportation expenses and even tickets to other Beijing Olympic sporting events.  (Compl. ¶¶ 17-18.)

Procedural History

Plaintiff filed this action on November 4, 2009.  Jurisdiction is based on diversity of citizenship, in that Plaintiff is a corporation organized and existing under the laws of the province of Manitoba, Canada and maintains its principal place of business in Winnipeg, Manitoba; THG is a Pennsylvania corporation with its principal place of business in Pittsburgh, Pennsylvania; Hutton and Ash are individuals residing in Pittsburgh, Pennsylvania; and the amount in controversy is in excess of $75,000.00, exclusive of interest and costs.  (Compl. ¶¶ 1-5.)  The complaint alleges that Defendants made negligent misrepresentations regarding how they would obtain the Olympics Opening Ceremony tickets (Count I), that they committed fraud to induce Roadtrips to enter into the ticket purchase orders (Count II) and that they breached their contractual obligations by failing to produce the tickets as promised (Count III).

On January 4, 2010, Defendants filed a motion to dismiss Counts I and II of the

complaint. They argue that: 1) both Count I and Count II fail to state a claim upon which relief can be granted because the purchase orders contained a disclaimer that the tickets would be purchased on the "secondary market"; 2) the parol evidence rule would bar any consideration of representations made prior to the contracts that contradict the disclaimer; and 3) the claims are barred by the gist of the action doctrine because the parties entered into contracts and Plaintiff has alleged a breach of contract claim in Count III.

Plaintiffs respond that: 1) Defendants have misstated the averments of the complaint, which alleges that Defendants represented that their sources would be sponsors, sports federations or some other member of the Olympic Family and that Ash specifically represented that the tickets were not being sourced from a ticket broker; 2) the parol evidence rule does not apply where the existence of a custom or usage to explain the meaning of words in a writing is concerned and the invoices are not integrated documents, such that resort must be made to pre-agreement representations to answer the question of the source of the tickets; an 3) the gist of the action doctrine does not apply to claims asserting negligent misrepresentation and fraud.

Standard of Review

The Supreme Court has recently stated that:

> Under Federal Rule of Civil Procedure 8(a)(2), a pleading must contain a "short and plain statement of the claim showing that the pleader is entitled to relief." As the Court held in [Bell Atlantic Corp. v.] Twombly, 550 U.S. 544, 127 S.Ct. 1955, 167 L.Ed.2d 929 [(2007)], the pleading standard Rule 8 announces does not require "detailed factual allegations," but it demands more than an unadorned, the-defendant- unlawfully-harmed-me accusation. Id., at 555, 127 S.Ct. 1955 (citing Papasan v. Allain, 478 U.S. 265, 286, 106 S.Ct. 2932, 92 L.Ed.2d 209 (1986)). A pleading that offers "labels and conclusions" or "a formulaic recitation of the elements of a cause of action will not do." 550 U.S., at 555, 127 S.Ct. 1955. Nor does a complaint suffice if it tenders "naked assertion[s]" devoid of "further factual enhancement." Id., at 557, 127 S.Ct. 1955.

>To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to "state a claim to relief that is plausible on its face." <u>Id.</u>, at 570, 127 S.Ct. 1955. A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged. <u>Id.</u>, at 556, 127 S.Ct. 1955. The plausibility standard is not akin to a "probability requirement," but it asks for more than a sheer possibility that a defendant has acted unlawfully. <u>Ibid.</u> Where a complaint pleads facts that are "merely consistent with" a defendant's liability, it "stops short of the line between possibility and plausibility of 'entitlement to relief.' " <u>Id.</u>, at 557, 127 S.Ct. 1955 (brackets omitted).

<u>Ashcroft v. Iqbal</u>, 129 S.Ct. 1937, 1949 (2009).

The Court of Appeals has stated that:

>To decide a motion to dismiss, courts generally consider only the allegations contained in the complaint, exhibits attached to the complaint and matters of public record.... [In addition,] a court may consider an undisputedly authentic document that a defendant attaches as an exhibit to a motion to dismiss if the plaintiff's claims are based on the document.

<u>Pension Benefit Guaranty Corp. v. White Consolidated Indus.</u>, 998 F.2d 1192, 1196 (3d Cir. 1993) (citations omitted). Thus, the purchase orders, which are relevant to the contract referred to in paragraph 10 of the complaint and which are attached to the motion to dismiss, may be considered without converting the motion into a motion for summary judgment.

<u>Purchase Order Disclaimers</u>

Each of the three purchase orders for the tickets Roadtrips purchased from THG contained the following disclaimer:

>The Hutton Group, Inc. (THG) provides its clients access to Olympic Ticket blocks from the secondary market. THG does not claim to be an Official Ticket Agent of the National Olympic Committee, the International Olympic Committee, nor the Beijing Organizing Committee Olympic Games (BOCOG).

(Defs.' Mot. Dismiss Exs. A, B, C at 2.)[1]  Defendants argue that Roadtrips was well aware that tickets would be bought on the secondary market and thus they made no misrepresentations. They further contend that any attempt by Plaintiff to argue otherwise based upon oral representations preceding the purchase orders would be barred by the parol evidence rule. Plaintiff responds that Defendant has misstated the averments of the complaint and that the term "secondary market" does not mean what Defendants claim it does.

>   David Guenther, President of Roadtrips (Guenther Aff. ¶ 1),[2] states that:
>
>   The term "secondary market" as the source of the sports-related event tickets is known and understood by me and others in the business of procuring sports-related event tickets, including Olympics event tickets, for inclusion in travel packages.  A supplier of tickets from the secondary market (such as [THG]) is not the officially sanctioned ticket agent for the event, and tickets sold on the "secondary market" are not procured directly from the entity which originally issued the tickets or that entity's authorized re-seller (collectively, "issuing entity").  Customarily, however, within the "secondary market", reliable sources of legitimate tickets exist.  For Olympic event tickets, sponsors and Olympic Family members are such reliable sources because they receive legitimate tickets directly from the issuing entity and, from time to time, solicit interested buyers on the secondary market.
>
>   Hutton/Ash assured Roadtrips that [THG] had an agreement with sponsors or Olympic Family members to obtain Opening Ceremony tickets from them, and I understood Hutton/Ash's representation that Hutton would procure the Opening Ceremony tickets direct from sponsors or Olympic Family members to mean that Hutton/Ash would obtain the tickets from those particular sources within the "secondary market."

(Guenther Aff. ¶¶ 8-9.)

To state a claim for negligent misrepresentation under Pennsylvania law, a plaintiff must show:

---

[1]   Docket No. 6.

[2]   Pl.'s Br. (Docket No. 15) Ex. A.

    (1) a misrepresentation of a material fact;

    (2) that the misrepresentor either knew of the misrepresentation, made the misrepresentation without knowledge as to its truth or falsity, or made the representation under circumstances in which he or she ought to have known of its falsity;

    (3) that the representor intended the representation to induce another to act on it; and

    (4) that injury resulted to the party acting in justifiable reliance on the misrepresentation.

<u>Gibbs v. Ernst</u>, 647 A.2d 882, 890 (Pa. 1994).[3]  To state claim for fraud, a plaintiff must show:

    (1) A representation

    (2) which is material to the transaction at hand;

    (3) made falsely, with knowledge of its falsity or recklessness as to whether it is true or false;

    (4) with the intent of misleading another into relying on it;

    (5) justifiable reliance on the misrepresentation; and,

    (6) the resulting injury was proximately caused by the reliance.

<u>Heritage Surveyors & Eng'rs, Inc. v. National Penn Bank</u>, 801 A.2d 1248, 1250-51 (Pa. 2002). Defendants argue that Plaintiff cannot show that they made a misrepresentation of a material fact when the purchase orders disclosed that the tickets would be purchased on the "secondary market."

    The Pennsylvania Supreme Court has stated that:

        In cases of a written contract, the intent of the parties is the writing itself.

---

[3]    Defendants have asserted that Pennsylvania law applies to this case (Docket No. 7 at 4-5) and Plaintiff has stated that it does not contest this assertion for purposes of the pending motion (Docket No. 15 at 6 n.4).

> If left undefined, the words of a contract are to be given their ordinary meaning. When the terms of a contract are clear and unambiguous, the intent of the parties is to be ascertained from the document itself.  When, however, an ambiguity exists, parol evidence is admissible to explain or clarify or resolve the ambiguity, irrespective of whether the ambiguity is patent, created by the language of the instrument, or latent, created by extrinsic or collateral circumstances.  A contract is ambiguous if it is reasonably susceptible of different constructions and capable of being understood in more than one sense.  While unambiguous contracts are interpreted by the court as a matter of law, ambiguous writings are interpreted by the finder of fact.

Kripp v. Kripp, 849 A.2d 1159, 1163 (Pa. 2004) (citations omitted).  The parol evidence rule applies to tort claims as well as contract-based claims.  Dayhoff, Inc. v. H.J. Heinz Co., 86 F.3d 1287, 1299-1301 (3d Cir. 1996).  Thus, the first issue is whether the contract is ambiguous, which is a question of law to be determined by the court.  Kripp, 849 A.2d at 1164 n.5.  See also Sanford Inv. Co. v. Ahlstrom Mach. Holdings, Inc., 198 F.3d 415, 421 (3d Cir. 1999).

The Court concludes that the contracts are ambiguous as to the meaning of the term "secondary market" and thus even if Guenther's explanation of the term "secondary market" constitutes parol evidence, it may be presented to clarify the meaning of this term.  In addition, the purchase orders do not recite the entire agreement between the parties with respect to the source of the tickets purchased.  That is, they are not integrated contracts and other evidence may be cited to supply missing information.

Moreover, as Plaintiff observes, the allegation of the complaint is not that Defendants failed to reveal that the tickets would be purchased on the secondary market, but that Defendants misrepresented the source within the secondary market from which they would purchase the tickets.  Guenther's explanation does not conflict with the language in the purchase orders.

Thus, even considering the purchase orders, there is a genuine issue of material fact regarding the meaning of the term "secondary market" and what THG represented with respect to

the source from which it would obtain the tickets.  Defendants' arguments that Counts I and II must be dismissed based upon the disclaimers in the purchase orders and the parol evidence rule are unavailing.

### The Gist of the Action Doctrine

The Court of Appeals has stated that:

> In adjudicating a case under state law, we are not free to impose our own view of what state law should be; rather, we are to apply state law as interpreted by the state's highest court in an effort to predict how that court would decide the precise legal issues before us.  Kowalsky v. Long Beach Twp., 72 F.3d 385, 388 (3d Cir. 1995); McKenna v. Pacific Rail Serv., 32 F.3d 820, 825 (3d Cir. 1994).  In the absence of guidance from the state's highest court, we are to consider decisions of the state's intermediate appellate courts for assistance in predicting how the state's highest court would rule.  McKenna, 32 F.3d at 825; Rolick v. Collins Pine Co., 925 F.2d 661, 664 (3d Cir. 1991) (in predicting state law, we cannot disregard the decision of an intermediate appellate court unless we are convinced that the state's highest court would decide otherwise).

Gares v. Willingboro Township, 90 F.3d 720, 725 (3d Cir. 1996).  Because this is a diversity action, the Court must predict how the Pennsylvania Supreme Court would rule if presented with this situation.  Although the Pennsylvania Supreme Court has not addressed the gist of the action doctrine, the Pennsylvania Superior Court and federal courts applying Pennsylvania law have done so.

Under the gist of the action doctrine, "a claim should be limited to a contract claim when 'the parties' obligations are defined by the terms of the contracts, and not by the larger social policies embodied in the law of torts.'"  Bohler-Uddeholm America, Inc. v. Ellwood Group, Inc., 247 F.3d 79, 104 (3d Cir. 2001) (quoting Bash v. Bell Tel. Co., 601 A.2d 825, 830 (Pa. Super. 1992)).  Defendants contend that their obligations are defined by the terms of the contracts and not the larger social policies embodied in the law of torts and thus Plaintiff's tort-based claims

are barred by the gist of the action doctrine.

However, courts have also addressed the interplay between fraud and the gist of the action doctrine.  The question was addressed at length by the Pennsylvania Superior Court in eToll, Inc. v. Elias/Savion Advertising, Inc., 811 A.2d 10 (Pa. Super. 2002).  As summarized by a more recent Superior Court panel:

> Following a thorough analysis of the issue, the eToll Court concluded that the gist-of-the-action doctrine would apply to bar a claim for fraud in the performance of a contract. However, it also observed that the gist-of-the-action doctrine would not necessarily bar a fraud claim stemming from the fraudulent inducement to enter into a contract. The court reasoned that if the fraud did not concern the performance of contractual duties, then the gist of the action would be the fraud, rather than any contractual relationship between the parties. [eToll, 811 A.2d] at 19; see also Air Products and Chemicals, Inc. v. Eaton Metal Products Co., 256 F. Supp. 2d 329, 341 (E.D. Pa. 2003) (discussing eToll and noting distinction between fraud in performance and fraud in inducement claims: "fraud in the inducement claims are much more likely to present cases in which a social policy against the fraud, external to the contractual obligations of the parties, exists.").

Sullivan v. Chartwell Inv. Partners, LP, 873 A.2d 710, 719 (Pa. Super. 2005).

In this case, as in Sullivan, Plaintiff has alleged that Defendants made fraudulent representations that induced it to enter into the contracts.  Specifically, Plaintiff alleges that Defendants fraudulently and/or negligently promised to obtain the tickets from certain sources within the secondary market (sponsors, sports federations or some other member of the Olympic Family), but not from other sources (ticket brokers) even though they had no intention of fulfilling this promise.  Plaintiff has stated that, if it had known that THG did not have a binding agreement to obtain the tickets through an Olympic Games sponsor or Olympic Family member, it would not have entered into contracts with THG in the first instance.  (Guenther Aff. ¶ 6.)  Thus, these tort claims are collateral to the performance of the contracts themselves and are not barred by the gist of the action doctrine.  Therefore, Defendants' argument to dismiss Count I and

II based on the gist of the action doctrine is unavailing and will be rejected.

     An appropriate order follows.

                                            s/Robert C. Mitchell
                                            ROBERT C. MITCHELL
                                            United States Magistrate Judge

Dated: February 22, 2010